**Joanna DiMarco ZAPPA, Plaintiff,**

v.

**Hector Rivera CRUZ, et al., Defendants.**

**No. CIV. 88–692 (JP).**

United States District Court, D. Puerto Rico.

Nov. 23, 1998.

Arturo Aponte Pares, San Juan, PR, for Plaintiffs.

Ana M. Otero Cintron, Department of Justice of Puerto Rico Federal Litigation Division San Juan, PR, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS

PIERAS, District Judge.

## I. INTRODUCTION AND BACKGROUND

The Court held a bench trial on September 18, 1997 to determine the amount of damages owed by Defendants to the remaining Plaintiff, Joanna DiMarco Zappa ("DiMarco").[1] This Order will (1) address the issue of immunity, (2) set forth the Court's findings of fact and conclusions of law regarding damages, (3) address the propriety of punitive damages and, finally, (4) address DiMarco's right to attorneys' fees. Prior to that, however, the Court believes a summary of this protracted and convoluted litigation is in order.

The Complaint in this case was filed on April 12, 1988, by John Fulcher Harris ("Harris"). Harris's Complaint alleged that

---

1. DiMarco's coplaintiff, John Fulcher Harris, is no longer a party to this case. The Court will use the term "Plaintiffs" when referring to both DiMarco and Harris, but will simply use her name when referring to DiMarco only.

he had taken the examination to become a realtor in Puerto Rico in October 1987; that the exam had been given in English; and that he had been notified in February 1988 that he had not passed the exam. Harris' Complaint further alleged that when he asked an employee at the Real Estate Examining Board when he could take the exam again, he was told that the exam would no longer be given in English, even though it had been given in both English and Spanish each of the prior seven years. Harris sued under 42 U.S.C. § 1983 and Puerto Rico law, alleging that the Defendants had (1) violated his right to take the exam in English, protected by P.R. Laws Ann. tit. 1 § 51,[2] and (2) violated his right to equal protection of the law, protected by the Fourteenth Amendment[3] to the Constitution of the United States. He sought injunctive relief in the form of an order directing Defendants to give the realtor's exam in English, compensatory damages for mental anguish, and attorneys' fees.

On April 18, 1988, Harris filed an Amended Complaint joined by DiMarco.[4] The Amended Complaint restated Harris' original allegations and further asserted that DiMarco had also taken the October examination and been informed that she had failed.

The Amended Complaint also charged that DiMarco had requested and been denied reconsideration, leaving her with no ability to determine if the exam had been properly graded. Plaintiffs also asserted that the English version of the exam had been different from the Spanish version and that no person who had taken the English version had passed. Moreover, when DiMarco had gone to the Examining Board's offices, she had been told, "how do you think you are going to sell real estate in Puerto Rico if you don't speak Spanish?" When she asked why the exam would no longer be given in English, she was told that "we have to worry about our people eating rice and beans," clearly indicating that the Board was protecting jobs in Puerto Rico from usurpation by continental Americans. Plaintiffs' Amended Complaint again asserted a violation of P.R. Laws Ann. tit. 1, § 51 and their right to equal protection guaranteed by the Fourteenth Amendment; it included the new allegation that their right to due process, also protected by the Fourteenth Amendment, had been violated as well. Plaintiffs again sought injunctive and monetary relief.

On July 15, 1988, the Court heard the parties' arguments with respect to Plaintiffs'

**2.** In 1987, Puerto Rico recognized both English and Spanish as official languages:

In all the departments of the Commonwealth Government and in all the courts of this island, and in all public offices the English language and the Spanish language shall be used indiscriminately; and, when necessary, translations and oral interpretations shall be made from one language to the other so that all parties interested may understand any proceeding or communication made therein.

P.R. Laws Ann. tit. 1 § 51 (1991 supp.). In April 1991, the Puerto Rico legislature repealed § 51 and established Spanish as the only official language of Puerto Rico.1991 P.R. Laws Act No. 4. In January 1993, however, the legislature repealed Act No. 4 and once again instituted a dual official language scheme:

Spanish and English are established as the official languages of the government of Puerto Rico. Both may be used indistinctly in all departments, municipalities, or other political subdivisions, agencies, public corporations, offices, or governmental dependencies of the executive, legislative, and judicial branches of the Commonwealth of Puerto Rico, pursuant to §§ 59–59f of this title, or as provided by special law.

P.R. Laws Ann. tit. 1 § 59.

**3.** "Puerto Rico is subject to the .... equal protection guarantees of either the Fifth or the Fourteenth Amendment." *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 331 n. 1, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (citing *Examining Bd. v. Flores de Otero*, 426 U.S. 572, 599–601, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976)). In either case, our analysis will be the same. Hereinafter, when referring to the Equal Protection Clause or the Fourteenth Amendment, the Court understands that the Fifth Amendment may or may not be applicable.

**4.** Both Harris' Complaint and Harris' and DiMarco's Amended Complaint named as Defendants: Héctor Rivera–Cruz (Puerto Rico Secretary of Justice), Maria Socorro–Cintrón (President of the Board), Awilda Vilches–Reyes (Secretary of the Board), and Eddie Nieves, Mary Jo González, Federico Cedó–Alzamora, and Eusebio Cabanillas (Board members). The Court dismissed the complaint against Héctor Rivera–Cruz in its Judgment of March 9, 1990 (docket No. 88).

request for injunctive relief. On March 27, 1989, the Court issued a preliminary injunction and ordered Defendants to give the realtor's exam in both English and Spanish. At a status conference held in March, 1990, Defendants agreed to continue giving the exam in English, nullifying the need for a permanent injunction. On April 23, 1991, after several years of protracted legal wrangling, the Court found that Defendants had violated Plaintiffs' constitutional right to equal protection of the law by giving them different exams than the exams given to native, Spanish speaking Puerto Ricans applying for brokers licenses and by grading their exams incorrectly and unfairly. The Court analyzed Plaintiffs' exams and found that both had actually passed the exam. Indeed, although Defendants had initially given DiMarco a score of 64, the Court determined she had actually earned a score of 97. The Court, finding that Plaintiffs' rights had been violated, ordered Defendants to issue Plaintiffs the licenses they had been wrongly denied. Believing all issues had been resolved, the Court entered judgment. On July 1, 1991, the Court ordered Defendants to pay costs in the amount of $614.00.

When Defendants finally issued Plaintiffs' certificates, the certificates stated, on their face, that they had been issued pursuant to court order.[5] On March 30, 1992, the Court ordered Defendants to rectify the situation by supplying Plaintiffs with licenses exactly like those issued to any other passing applicant. Defendants failed to comply, and on August 10, 1992 the Court found Defendants in contempt. Only then did Defendants comply by issuing the proper certificates—over four years after denying Plaintiffs' right to equal protection and over a year after the Court had entered judgment ordering Defendants to desist from discriminating against Plaintiffs and to issue their rightfully achieved certificates.

On February 8, 1993, DiMarco[6] asked for a hearing on damages. The Court, under the impression that all of the issues had been resolved by the parties' mutual consent when the Court issued its injunction and entered judgment, held that Plaintiffs had waived any right to compensatory, monetary relief. DiMarco appealed, and the United States Court of Appeals held (1) that Defendant had the burden of proving that DiMarco had indeed waived any right to monetary relief and (2) that Defendants had not carried their burden. *Harris v. Rivera Cruz*, 20 F.3d 507, 511–12 (1st Cir.1994). On remand, the Court held a hearing to determine whether DiMarco had actually waived her right to further compensatory damages. On February 20, 1996, the Court held that DiMarco had not waived her right to damages and set a bench trial on damages. On September 18, 1997, the Court heard the parties' evidence and arguments regarding DiMarco's damages. The Court will now address Defendants' immunity defense and issue its findings of fact and conclusion of law on the issue of damages.

## II. IMMUNITY

### A. Eleventh Amendment Immunity

■ The Eleventh Amendment bars this Court from hearing claims for damages against the Commonwealth of Puerto Rico. *De Leon Lopez v. Corporacion Insular de Seguros*, 931 F.2d 116, 121 (1st Cir.1991) ("the Eleventh Amendment, despite the absence of any express reference, pertains to Puerto Rico in the same manner, and to the same extent, as if Puerto Rico were a State"). *Figueroa–Rodriguez v. Aquino*, 863 F.2d 1037, 1044 (1st Cir.1988) (Puerto Rico has not waived Eleventh Amendment immunity to be sued for damages in federal court); *Ursulich v. Puerto Rico National Guard*, 384 F.Supp. 736, 737 (D.P.R.1974) (Puerto Rico has consented to be sued for damages only in the Courts of the Commonwealth of Puerto Rico) Suits against state officials qua state officials are actually suits against the state. *Will v. Michigan Dept. of State Po-*

---

5. The phrase, "DADA POR ORDEN DEL TRIBUNAL FECHADA EL 19 DE ABRIL DE 1991" was written on the face of the certificate issued to DiMarco.

6. By this time, John Fulcher Harris had dropped from the case, probably because he was fed up with the absurd length of this litigation, a problem caused, for the most part, by Defendants' dilatory litigation tactics.

*lice,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Therefore, Defendants in the case at bar cannot be held liable *in their official capacities* for monetary damages.

### B. Qualified Immunity

■ "Qualified immunity shields government officials performing discretionary functions from civil liability for money damages when their conduct does not violate 'clearly established' statutory authority or constitutional rights of which a reasonable person would have known." *Roldan–Plumey,* 115 F.3d at 65 (quoting *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 704 (1st Cir. 1993)); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Defendants assert that they are protected from liability by qualified immunity because the federal law they violated was not clearly established. But in reaching this conclusion, Defendants muddle the right at issue in this case—the right to equal protection of the law—with laws "regarding a state's prerogative in establishing an official language in which all state government transactions have to be conducted." It is in that misunderstanding of the right at issue that Defendants' qualified immunity argument fails.

■ The Amended Complaint alleged violations of (1) a Puerto Rico statute establishing English as one of its two official languages and (2) the federal constitutional guarantee that persons in the United States will be afforded equal protection of the law. Although Defendants purport to direct their attention toward the DiMarco's equal protection claim, they confuse it with her Puerto Rico law claim, asserting that no federal law clearly establishes that, "as a matter of equal protection law, or principles of due process of law, a state is barred from establishing Spanish or English for that matter as the official language in which all government business is to be conducted." Whether a state's prerogative to chose an official language is circumscribed by federal law, however, is of no moment to the case at bar. That is so because the Constitution of the United States expressly forbids state actors from discriminating against persons based on invidious classifications, and that is what Defendants in this case did. In other words, the constitutional violation committed by Defendants was not their failure to provide the real estate brokers test in English,[7] but the disparate treatment given to Plaintiffs based on an impermissible classification—Plaintiffs' status as continental Americans.

■ The Fourteenth Amendment prohibits state action which favors or disfavors a person or persons relative to those similarly situated based on some classification that bears an insufficient relationship to any legitimate governmental interest. In other words, the government may not treat similarly situated people differently based on classifications made without justification. The character of the classification determines the requirements of the justification. *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (invidious classifications—those based upon race, religion, nationality, alienage, or some other suspect class—must serve a compelling government interest and no less restrictive alternative can be available); *Craig v. Boren,* 429 U.S. 190–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (classifications based on gender or illegitimacy must be substantially related to the achievement of an important government objective); *Schweiker v. Wilson,* 450 U.S. 221, 234–35, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981) (where the classification is neither invidious nor based upon gender or illegitimacy, it will stand so long as it bears some rational relationship to the advancement of a reasonable and identifiable governmental objective). The evidence has demonstrated beyond peradventure that Defendants treated Plaintiffs differently because the latter were continental Americans—Defendants provided them with a different exam than those given to native Puerto Rican applicants and then graded their exams unfairly. They did so to protect their "rice and beans," or, more precisely, to assure that jobs in Puerto Rico are held by native Puerto Ricans. Under the

---

**7.** The Court makes no comment on the constitutionality of Defendants' unwillingness to adminis-

ter the test in English.

Equal Protection Clause of the Constitution, Defendants had the obligation to evaluate both versions of the exam equally, without discriminating against continental Americans, or grading any version differently from the other. That is so regardless of any alleged controversy relating to official language in government.

The obligation to treat continental Americans equally in Puerto Rico cannot be gainsaid; and the Court emphatically holds that any argument that such an obligation was not clearly established when Defendants violated Plaintiffs' rights must fail. First, the supremacy in Puerto Rico of the United States Constitution, and of the Equal Protection Clause in particular, has been clearly established. *Posadas de Puerto Rico*, 478 U.S. at 331 n. 1, 106 S.Ct. 2968. Second, the rule that classifications based on national origin, ancestry, and/or race must withstand the strictest constitutional scrutiny has also been clearly established. *Plyler*, 457 U.S. at 216–17, 102 S.Ct. 2382. And finally, the classification employed by Defendants was clearly invidious, in the nature of classifications based on national origin, ancestry, and race, and cannot withstand strict scrutiny. Only the Court's final conclusion needs further analysis.

While the philosophy of individual freedom underlying this nation's constitutional and legal systems has not always been inclusive, the moral and intellectual indefensibility of many once-accepted distinctions has slowly but undeniably illuminated our legislation and jurisprudence, if not the mind-set of most Americans. It would be folly to deny the chequered past this nation has with respect to the ill-treatment of many minorities. *E.g.*, *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (upholding the interment of Japanese Americans in detention camps); *Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (upholding "separate but equal" doctrine); *Dred Scott v. Sanford*, 60 U.S. (19 How.) 393,

15 L.Ed. 691 (1856) (holding that members of "the negro race" are not citizens for the purposes of the United States Constitution and that the Declaration of Independence does not include slaves as part of the people). Indeed, parts of the Constitution itself are emblematic of the racism that our founding fathers incorporated into the legal fabric of this nation. *E.g.*, U.S. Const. art IV, § 2 ("no Person held to Service of Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour ...."). But our nation's conscience has evolved, and, based largely on the efforts and courage of people like Abraham Lincoln, Martin Luther King, and Thurgood Marshall, the law no longer tolerates state-sanctioned discrimination based on racial or ethnic classifications. As a people and a nation, we have come to act upon the indisputable knowledge that "distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." [8]

The trailhead to the path of our nation's moral ascension regarding invidious discrimination can be found in the abolitionist movement supporting the eradication of institutionalized slavery. Precipitated by the *Dred Scott* decision, the schism between the states whose citizens advocated the abolition of slavery and the states whose citizens sought the continuation of the insidious practice erupted into the Civil War. The victory of the Union forces was a victory for abolition and resulted in the emancipation of all slaves. U.S. Const. amend. XIII, § 1. Within three years of the ratification of the Thirteenth Amendment, the states ratified the Fourteenth Amendment, the primary objective of which "was to secure to the colored race, then recently emancipated, the full enjoyment of their freedom." *Holden v. Hardy*, 169 U.S. 366, 382, 18 S.Ct. 383, 42 L.Ed. 780 (1898).

But in the decades following the civil war, our lawmakers and judges backslided into an

---

**8.** Ironically, this beautifully expressed sentiment comes from the Court's now infamous and discredited opinion in *Hirabayashi v. United States*, 320 U.S. at 100, 63 S.Ct. 1375 upholding the imposition of a curfew on Japanese Americans during World War II.

unjust accord—known as the "separate but equal" doctrine—that was justifiable in theory but pernicious in practice. *See Plessy,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256. It was not until the civil rights movement galvanized again in the middle of this century that our nation was again forced to address the issue of invidious discrimination. By dint of courage, and utilizing the weaponry provided by the Fourteenth Amendment, leaders of the civil rights movement were able to attack and defeat such state-sponsored iniquities as segregation in public schools. *See Brown v. Bd. of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Then, with the enactment of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, Congress provided a powerful weapon for fighting even private discrimination. The civil rights statutes, in tandem with the Fourteenth Amendment, have been employed to relegate invidious discrimination to the small minds of a handful of bigots and to certain cultural backwaters of our nation. In the last four decades, we have accomplished much in the pursuit to ensure the civil rights of all people in our country. Some have called this largely successful battle against bigotry and discrimination our nation's finest achievement; but the war has not been won, and so long as discrimination remains, we must remain vigilant for abuses.

Moreover, the sweep of the battle has broadened, and our understanding of discrimination comprises more than classifications based on color—discrimination can be more subtle without losing its insidious character. Thus, while "the primary object of [the Fourteenth] Amendment was to secure to the colored race, then recently emancipated, the full enjoyment of their freedom," *Holden,* 169 U.S. at 382, 18 S.Ct. 383, the much broader scope of its impact has long been established. *See generally Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872); *Holden,* 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780; *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Since its ratification, various minorities, not all of whom can be classified by their race, have sought to protect their rights via the Fourteenth Amendment's Equal Protection Clause. *E.g., Yick Wo,* 118 U.S. 356, 6 S.Ct. 1064; *Minor v. Happersett,* 88 U.S. (21 Wall.) 162, 22 L.Ed. 627 (1874). And the Supreme Court has long held that unjustified discrimination based upon ancestry and/or national origin violates the Equal Protection Clause in the same manner as classifications based on race. *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 2028 n. 5, 95 L.Ed.2d 582 (1987); *e.g., Hernandez v. Texas,* 347 U.S. 475, 479, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Oyama v. California,* 332 U.S. 633, 646, 68 S.Ct. 269, 92 L.Ed. 249 (1948).

For obvious reasons, the Equal Protection Clause has seldom been invoked to protect "Americans" from national origin discrimination. Clearly, there are few places in the United States where north Americans will be classified as such to their own detriment. But Puerto Rico is such a place.

### A. Discrimination based upon kind of citizen classification.

All parties were casting the die of statehood when the United States troops walked into the shores of Guánica, Puerto Rico, and were welcomed by the local inhabitants; when the people living in Puerto Rico were made United States citizens in 1917 and they accepted such citizenship; when the United States citizens of Puerto Rico gave their ounce of blood for the United States in two World Wars, Korea, Vietnam, and the Gulf, with glee and great patriotic fervor,[9] and when more than two million United States citizens who were residing in Puerto Rico voluntarily moved into the states of the union and by doing so accepted statehood voluntarily. Because of the recalcitrance of some men, the matter of statehood for the territory of Puerto Rico has not been formally resolved. This ambivalence on both sides to close the circle and to formally organize Puerto Rico into a state has created a difference of civic proportions. As of today this difference sets apart both United States citizens born or residing in Puerto Rico and

---

9. *See generally* Luis Dávila Colón, *The Blood Tax,* 40 Rev. Col. Abog. P.R. 603, 619 (1979) (discussing the Puerto Rican contribution to the United States war efforts).

those born or residing in the other states of the Union.

Discrimination based upon the classification of kind of American citizenship is suspect under the Constitution, and under the circumstances of Puerto Rico the American citizens born or residing in Puerto Rico are viewed by most Puerto Ricans as having a political condition distinct from those born and/or residing in the states of the Union. *See generally* Juan R. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal,* 269 (1985).

### B. Ancestry classification.

■ Because ancestry may not be as easy to classify as physical attributes like skin color, the determination of whether a classification based on ancestry has been established depends in large measure upon the views held by members of the community where the alleged discrimination occurs. *Hernandez,* 347 U.S. at 479, 74 S.Ct. 667 (burden of establishing that plaintiffs are members of a separate class may be "demonstrated ... by showing the attitude of the community"). Because it is so well known in this community, the Court may take judicial notice that in Puerto Rico continental Americans (often called *norteamericanos, estadounidenses,* or *americanos* ) are viewed by most Puerto Ricans as having a political condition and heritage distinct from Puerto Rican Americans. Fed.R.Evid. 201(b). That is certainly not to say that most Puerto Ricans view the distinction as a basis for discrimination, only that Puerto Ricans generally do not consider themselves to be of the same political and ethnic heritage as persons from the continental United States. Puerto Ricans generally consider their heritage and/or ancestry to be Spanish with black African influence or, simply, Puerto Rican while continentals have a more diverse ethnic and national background. Given the well-known fact that North Americans are considered in this community to be of a distinct political

and ethnic heritage, discrimination based upon that classification is suspect under the Constitution. The fact that many *norteamericanos* in Puerto Rico cannot be distinguished solely by physical appearance has no relevance. See *Strauder v. West Virginia,* 100 U.S. 303, 308, 25 L.Ed. 664 (1879) ("nor if a law should be passed excluding naturalized Celtic Irishmen, would there be any doubt of its inconsistency with the spirit of the [Fourteenth] amendment"); *cf. Al-Khazraji,* 481 U.S. at 613, 107 S.Ct. 2022 ("a distinctive physiognomy is not essential to qualify for [42 U.S.C.] § 1981 protection"). Therefore, when state actors in Puerto Rico classify continental Americans for disparate treatment, their actions, where they fail to withstand strict scrutiny, clearly violate the Equal Protection Clause.[10]

Perhaps the Court's holding is better demonstrated by looking at it from another perspective. Courts in the United States have long held that Puerto Ricans comprise a distinct ethnicity, and any classification based on that ethnicity is invidious. *E.g., Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d. Cir.1987); *cf. Wright v. Rockefeller,* 376 U.S. 52, 59–61, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964) (Douglas, J. dissenting). Certainly, a law in Vermont or Utah or Georgia denying Puerto Ricans the right to hold real estate licences would violate the Clause. It is precisely that classification that Defendants employed in this case—i.e., one segregating Puerto Ricans from non-Puerto Ricans. Although the courts that have heretofore considered the classification have done so in the context of continental Americans discriminating against Puerto Ricans, logic and fairness require the same analysis where the classification was effected in Puerto Rico in order to discriminate against continental Americans. In sum, the Court holds that discrimination against continental Americans in general, and Defendants' conduct in this case specifically, violate the clearly established constitutional guaranty that persons in this country

---

10. Theoretically, if such a classification could withstand strict scrutiny, it would not violate the Equal Protection Clause. But in reality, it is extremely unlikely that any such classification could be justified under strict scrutiny. *See Missouri v. Jenkins,* 515 U.S. 70, 121, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (strictest scrutiny has been automatically fatal in every instance the Court has applied, save for in *Korematsu* and *Hirabayashi,* two unusual war-time cases which have been discredited). Certainly, Defendants' actions in this case cannot.

receive equal treatment under the law. Therefore, Defendants can find no protection from the doctrine of qualified immunity. That aside, the Court now reaches its findings of fact and conclusions of law.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO COMPENSATORY DAMAGES

1. As outlined in the procedural history of this case, stated at length, *supra*, it was established long before the bench trial in this case that Defendants—Maria Socorro–Cintrón (President of the Board); Awilda Vilches–Reyes (Secretary of the Board); and Eddie Nieves, Mary Jo González, Federico Cedó–Alzamora, and Eusebio Cabanillas (Board members)—violated DiMarco's constitutional right to equal protection of the law when they discriminated against her based upon her heritage, ancestry, and/or national origin. The following findings of fact and conclusions of law focus on the compensatory damages to which DiMarco is entitled based on Defendants' violation of her rights.

2. Prior to moving to Puerto Rico, DiMarco worked as a supervisor in a New York hospital and later became co-owner of a liquor store in New York; she owned two apartments in New York; she lived in one and rented out the other. Trial Tr. at 5–7.

3. DiMarco first came to Puerto Rico on a visit in 1969; she moved to the island in 1981. Trial Tr. at 7–8.

4. She sold her business and properties in New York and purchased two apartments in the Condado area of San Juan between 1981 and 1984. Trial Tr. at 9, 15–16.

5. DiMarco took a course to prepare for the real estate license exam in Puerto Rico and took the exam in October 1987. Trial Tr. at 16–18.

6. The passing grade for the exam was a score of 70 out of 100; DiMarco was originally informed she failed with a score of 64.

7. When DiMarco went with her attorney to the Puerto Rico Department of Justice to identify some exam documents, an attorney for the government threatened and intimidated her and told DiMarco's attorney, "[y]our client isn't going to be able to fight this case. We are going to break her financially." Trial Tr. at 25–27. On a prior occasion, when she went to Defendants' office to inquire about taking the exam again, she was informed that the exam was no longer to be given in English because, "we have to worry about our own people eating rice and beans." Trial Tr. at 93.

8. Defendants violated DiMarco's right to Equal Protection by using different questions in the English and Spanish versions of the exam and by grading her exam unfairly; DiMarco actually earned a passing score of 97. Trial Tr. at 24.

9. When the Court ordered Defendants to issue certificates recognizing that Plaintiffs were licensed realtors, Defendants issued her an identifiable certificate expressly noting on its face that it had been issued by court order. The Court ordered Defendants to rectify the situation, but even then Defendants delayed issuing the certificate as ordered. DiMarco didn't actually receive her certificate until August 1991, four years after the exam and over a year after the Court had ordered Defendants to respect DiMarco's right to equal protection.

10. In September 1992, DiMarco started practicing as a real estate agent, procuring apartment sales and rentals in the Condado area. DiMarco had been involved in the purchase and sale of real estate in New York, but this was her first time working as a real estate broker. Trial Tr. at 7, 30. Between September 1992 and May 1993, DiMarco received commissions from a number of apartment transactions totaling $23,891.00. Trial Tr. at 37–44, 60–61, 65–75.

11. DiMarco's tax returns for 1992 and 1993 reflect the above total: the 1992 return with an adjusted gross income of $4,898.00 and the 1993 return with a gross income of $20,281.00 and an ad-

justed gross income of $7,263.86. Trial Tr. at 49.

12. In the years DiMarco spent in Puerto Rico prior to receiving her brokers license, she lived on savings derived from her New York properties, her liquor store business, and a life insurance policy. Trial Tr. at 118–130.

13. DiMarco should have mitigated her damages, particularly loss of income, by seeking employment during the four years her license was denied. The Court shall reduce DiMarco's lost-income damages by half for failure to mitigate damages. See Figueroa–Rodriguez v. Aquino, 863 F.2d 1037 (1st Cir.1988).

14. Taking into account DiMarco's total net income of $12,161.86 for 1992 and 1993, which she earned over an eight month period, the Court finds that DiMarco's yearly income would have been $18,242.76. DiMarco's income over the four years she was denied the license, reduced by 50% for her failure to mitigate, plus 8% interest, is $39,404.43. Thus, the Court finds that DiMarco should receive $39,404.43 for lost income.[11]

15. DiMarco suffered mental anguish during her entire ordeal, which has lasted now for nearly ten years: she felt unhappy, unwanted, and maligned in Puerto Rico; she felt that Defendants had destroyed her dream of living in Puerto Rico and doing business in real estate; and she could not believe such an injustice could occur in a place under the U.S. flag. Trial Tr. at 94–97. The Court finds that DiMarco should also receive $50,000.00 in damages for mental and emotional suffering.

16. Thus, Defendants owe DiMarco compensatory damages in the amount of $89,404.43.

## IV. PUNITIVE DAMAGES

In an action under 42 U.S.C. § 1983, punitive damages are available where a "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others" Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); Hernandez–Tirado v. Artau, 874 F.2d 866, 868 (1st Cir. 1989). It would be difficult to find a better example of callous indifference to federally protected rights than the wilful mistreatment of persons based on their heritage. Likewise, the Court can think of no act more deserving of deterrence under § 1983 than bigotry of the type displayed by Defendants in this case. See Smith, 461 U.S. at 49, 103 S.Ct. 1625 ("deterrence of future egregious conduct is a primary purpose of both § 1983 [citations omitted] and of punitive damages [citations omitted]").

Defendants discriminated against DiMarco because they did not believe English-speaking continental Americans should work in Puerto Rico and take away jobs from Puerto Ricans. Defendants informed DiMarco that government officials had to ensure their own people would have rice and beans, i.e. that non-locals could be discriminated against in favor of locals in the real estate business.[12] This is precisely the type of conduct that our society "will not tolerate" and which punitive damages were designed to address. Hernandez–Tirado, 874 F.2d at 869–70.

All citizens, regardless of race, ancestry, heritage, or national origin, are entitled to equal protection of the laws. Puerto Ricans should be especially sensitive to the type of discrimination exhibited by Defendants in this case, as many Spanish-speaking Puerto Rican Americans have, as United States citizens, moved to the continental United States

---

**11.** The Court used the following formula to calculate DiMarco's compensatory damages:
(1) DiMarco's net income per month during the eight (8) months she worked as a real estate broker, averaged out to one year (net income/8 × 12),
(2) multiplied by four(4) (the number of years between the exam and the time she was granted the license),

(3) divided by two (for DiMarco's failure to mitigate damages),
(4) plus 8% interest.

**12.** DiMarco was even threatened and intimidated by Defendants' attorney, who told her she would not be able to fight this case and that they were going to break her financially.

from Puerto Rico, rightfully expecting to receive equal treatment as citizens wherever they settle. Likewise, continental Americans must be permitted to enjoy the same liberty to travel and live in Puerto Rico without facing governmental discrimination that Puerto Rican Americans have to travel and live in the fifty states. Any attempts to prevent migration in either direction must be dissuaded, and punitive damages in suits such as this will go a long way toward achieving that goal. For these reasons, punitive damages are clearly appropriate in this case.

Defendants argue, however, that punitive damages would be unfair in this case because the behavior underlying this case resulted from the policies of another administration. Defendants argue that no further deterrence is needed because the discriminatory conduct occurred during a past Popular Democratic Party administration and that the current party in power, the New Progressive Party, believes in and enforces a policy built on the equality of all U.S. citizens. But, with respect to deterrence, the fact that the present administration has adopted a policy in compliance with the Equal Protection Clause provides no guarantee that present governmental policies will remain static—perhaps not all future administrations will espouse the same philosophical bent regarding continental Americans. In other words, Defendants' deterrence arguments fails to account for the continuing deterrent effect of punitive damages. Moreover, Defendants' argument misunderstands the dual function of exemplary damages—deterrence is only part of the goal. The word "punitive" makes the second goal of "punitive" damages obvious: they are also used to punish the wrongdoer. So even if deterrence were not served by the award of exemplary damages in this case (a conclusion the Court does not share with Defendants), punitive damages would nevertheless be warranted. Evidently the policy and philosophy of this administration in the particulars herein discussed is different from that of the administration in power at the time of the occurrence of the facts subject of this case. The Judgment herein is against the defendants. The government is not a party-defendant. Whether the present administration is going to cover the obligation of the defendants and pay on their behalf this Judgment is a matter that must be settled administratively. In sum, the award of exemplary damages will serve both to punish Defendants and to deter similar future conduct by warning that discrimination against continental Americans in Puerto Rico is unacceptable. The Court finds that Defendants' repeated violation of Plaintiffs' constitutionally protected rights warrants an award of $50,000.00 in punitive damages.

## V. Attorney's Fees

Title 42 U.S.C. § 1988(b) states that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ..." The U.S. Supreme Court has limited a court's discretion in applying § 1988(b), stating:

[t]he purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances [and] a prevailing plaintiff *should ordinarily recover an attorney's fee unless special circumstances render such an award unjust.'*

*Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968)).

In *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court established that the amount of the fee must be determined by the facts of each case using the lodestar method. *See Coutin v. Young & Rubicam P.R., Inc.*, 124 F.3d 331, 337 (1st Cir.1997). Under the lodestar method, the Court must first multiply the amount of hours reasonably expended by each attorney by the attorney's reasonable hourly rate. *Coutin*, 124 F.3d at 337. After determining the lodestar, the Court may then take into consideration such factors as (1) the success achieved and the results obtained by the plaintiff's attorney with respect to each of plaintiff's claims, (2) time spent on unsuccessful endeavors, (3) excessive and/or reproductive expenditures of time, and/or (4) the reasonableness of the attorney's billing rate. *Id.*

The various attorneys [13] who have represented DiMarco during this litigation have supplied billing sheets and reasonable hourly rates.[14] Attorney Aponte Parés billed DiMarco $15,462.50 for his services, which included just over one hundred and three hours of his time. DiMarco paid Aponte Parés' bill in full and seeks full reimbursement. DiMarco also seeks $10,850.00 for the work of Jane Becker, who spent just over fifty-four hours working on the case. Finally, DiMarco seeks $2,737.50 for the labor of Melvin Rosario Rodríguez, who spent just over eighteen hours working on the case. The total requested under § 1988(b) equals $29,050.00. The Court finds the sums sought by DiMarco for attorneys' fees to be completely reasonable, and hereby **GRANTS** DiMarco's request for fees in the amount of **$29,050.00.**

Defendants have raised several arguments against DiMarco's petition for attorneys' fees, but the Court finds them unpersuasive. First, Defendants assert that the fees associated with the Court's injunction were not requested in a timely manner under Local Rule 332, and therefore should be barred. Local Rule requires that attorneys' fees petitions "be filed within forty-five days following entry of judgment," barring an extension of time. Defendant asserts that the Court's judgment ordering Defendants to issue Plaintiffs' certificates constituted the judgment referenced by Rule 332. However, that was not the final judgment in this case. *Harris*, 20 F.3d at 511–12. The Court will not hold that Rule 332 requires the filing of piecemeal attorneys' fees petitions at the end of any stage of litigation. Awaiting the final judgment is not only perfectly acceptable, it is preferable, so that the Court may address the issue of attorneys' fees in one, fell swoop. Requiring the type of scattered attorneys'

fees litigation at the end of every claim, as Defendants' argument necessarily envisions, would be an inefficient waste of time in almost every case. The absurd length of this case is anomalous and should not be used to justify a rule that would generally prove unwieldy.

Defendant also asserts that DiMarco's attorneys' bill for services rendered between May 24, 1991 and August 21, 1992 should be barred under the doctrine of laches. For the same reasons outlined above, Defendants' laches argument has no merit. Again, the unusual length of this litigation was not the fault of Plaintiffs and should not be used to justify a rule different from that applied to other cases. Local Rules permit the filing of attorneys' fees petitions within forty-five days of the entry of judgment. DiMarco's petition is timely.

Third, Defendants assert that they are protected by qualified immunity from attorneys' fees. That argument has been rendered moot by the Court's analysis of Defendants' qualified immunity defense, *supra*.

Next, Defendants argue that DiMarco's fee petition with respect to hours spent litigating the damages phase of the case is premature under Federal Rule of Civil Procedure 54(d)(2)(B).[15] Normally, the Court might agree. But in this case, requiring DiMarco to re-file her petition after the entry of this judgment would waste everyone's time and provide no benefit. Defendants have known for a long time that Plaintiffs successfully litigated this case; they have had ample opportunity to oppose DiMarco's petition for attorneys' fees; and they have not been prejudiced by DiMarco's decision to file their petition prior to the issuance of the Court's judgment.

---

**13.** Attorney Arturo Aponte Parés initially served as DiMarco's counsel in this action. DiMarco has paid him in full for his services. Eventually, attorney Jane Becker of Troncoso & Becker took over DiMarco's representation. Attorney Melvin Rosao Rodriguez assisted Ms. Becker.

**14.** Mr. Aponte Parés bills at $150.00 per hour; Mr. Rosario Rodriguez bills at $150.00 per hour; and Ms. Jane Becker bills at $200.00 per hour. For the type of litigation involved in this case, the experience of these attorneys, the nature and

length of this litigation and its consequent "undesirability," those rates are certainly not unreasonable *Coutin*, at 337–338 n. 3 (these factors come from the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir.1974)).

**15.** "Unless otherwise provided by statute or order of the court, the motion must be filed and served no later than 14 days after entry of judgment." Fed.R.Civ.P. 54(d)(2)(B).

Next, Defendants assert that Plaintiffs' attorneys' efforts have not always met with success. The Court disagrees. DiMarco sought and obtained (1) injunctive relief forcing the Board to give the real estate exam in English and Spanish, (2) the issuance of DiMarco's real estate brokers license and the re-issuance of the certificate without extraneous notations regarding the Court's Order, and (3) damages. The Court cannot envision a more successful end to Plaintiffs' case. In cases "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee [which] will encompass all hours reasonably expended on the litigation ..." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933.

Finally, Defendants argue that the "unnecessary and duplicative" efforts by Attorney Melvin Rosario added nothing to Attorney Becker's work in this case. Again, the Court cannot agree:

> Time spent by two attorneys on the same general task is not, however, *per se* duplicative. Careful preparation often requires collaboration and rehearsal, and the court should not reward defendants for their vehement "Stalingrad defense," ... Indeed, because a litigant's staffing need and preparation time will often vary in direct proportion to the ferocity of her adversaries' handling of the case, this factor weighs heavily in the balance.

*Rodriguez–Hernandez v. Miranda–Velez,* 132 F.3d 848, 860 (1st Cir.1998). As the defense in the case at bar was certainly vigorous, the Court finds it reasonable that attorney Rosario assisted in the litigation of this case. There is no evidence that his work was unnecessary and/or duplicative.

## VI. THE ISSUE OF CULTURE AS RELATED TO DEFENDANT'S ALLEGATIONS

The facts of this unfortunate case and the arguments presented by the parties raise a number of socially and politically important issues. The Court feels compelled to address one in particular—a matter concerning the culture of the Puerto Ricans vis-a-vis Latin American culture. That issue is of particular importance in light of Defendants' attorney's

argument that the present administration, whose policies and views on status differ from those of the administration in power at the time the constitutional violations giving rise to this case occurred, should not be punished for the former administration's "bungling." *See supra.*

The specific matter to which the Court is referring, although probably not truly susceptible to such succinct summarization, has frequently been described as a question of culture. The party in charge during the former administration, the Popular Democratic Party ("PDP"), opposes Puerto Rico becoming a state. The PDP justifies its position in large measure on the perceived notion that Puerto Rico's is a "Latin American" culture, distinguishable from and therefore somehow incompatible with U.S. culture. The present administration on the other hand, that of the New Progressive Party, believes that Puerto Rico and its citizens have embraced and share the culture of the United States. To some degree this schism reflects divergent views of the meaning of the word "culture" and to some degree it reflects differing notions of both Latin American culture and U.S. culture. In any case, the Court finds the treatment afforded Plaintiffs in this case by employees of the Puerto Rico government to be a reflection of the ideology espoused by the PDP. It is an ideology that creates an "us" and "them" view (which often translates to an "us" versus "them" view) of continental Americans in Puerto Rico. The dangers of that ideology are on full display in this case. In the view of the undersigned judge, it is an ideology premised on a misunderstanding of what culture means and of what Puerto Rican and U.S. "culture" are.

Culture is an elusive concept, but taken in the context of the issue at hand—i.e., Puerto Rico's political status—the Court considers that the relevant inquiry must be one of *political culture.* Aspects of ethnic, linguistic, religious, or popular culture are not fundamental, and are indeed irrelevant to the matter of Puerto Rico's status *vis a vis* the United States. That is so for several related reasons. First of all, such classifications simply do not adequately define the people of

either Puerto Rico or the United States. The people of both comprise many so-called cultures. To classify all Puerto Ricans as Spanish or Catholic or to say that they all eat rice and beans and dance salsa would be both ludicrous and insulting. What about Puerto Ricans of Chinese descent, or English, or Corsican, or African, or North American? Are they less Puerto Rican than those whose great-grandfathers come from Valencia or Madrid? Clearly not. Likewise, the United States is perhaps the greatest conglomeration of cultures ever assembled under a single government. Although often given the moniker, "melting pot," the United States is perhaps better described as a mixing bowl, a place where many "cultural" elements coexist to form a whole without losing their individual flavors. Cultural diversity is part of the essence of the nation, and no single ethnic, religious, linguistic, or social characteristics can define its citizens. A second, related reason why we must focus on political culture, as opposed to a culture defined by other criteria, is that in both Puerto Rico and the United States classifications based on such criteria are considered wrong, both morally and legally. Indeed, such classifications are wrong precisely because they do not work. While the United States' record regarding the majority's (particularly with respect to race and ethnicity) treatment of minorities is far from unblemished, the nation as a whole has generally strived to rise above such classifications, especially during the last century. The people of Puerto Rico have similarly denounced classifications based on race, ethnicity, religion, and the like.

Other aspects of so-called culture—the food we eat, the music we listen to, the holidays we celebrate—in addition to being insufficient bases for fully describing either Puerto Rican or U.S. culture, are simply not significant to the question of status. Would becoming a state prevent Puerto Ricans from enjoying *pasteles* or *arroz con gandules* at Christmas time or from dancing *salsa* or *merengue*? Has living in the United States prevented Irish–American Catholics from celebrating St. Patrick's Day or Jewish–Americans from observing Passover and Yom Kippur? Have Chinese–Americans not maintained their Chinatowns and Italian Americans their Little Italies? More importantly, are there not more relevant factors to consider in analyzing political status, like economic opportunity, political stability, and a strong national belief in the protection of individual liberties.

In an attempt to support the cultural incompatibility argument against statehood without offending our sensitivities regarding cultural diversity, some commentators have attempted to define culture in more subtle ways. For example, Mayra Montero recently wrote an article, entitled "La Luz del Espíritu," for her weekly column in El Nuevo Día, in which she attempted to correlate nationality with cultural idiosyncrasies. Mayra Montero, *Primer Plano: La Luz del Espíritu*, El Nuevo Día, July 26, 1998, at 11. Although certainly better written than most,[16] her article typifies efforts of like-minded anti-statehood advocates. She argues that nationality cannot be rejected or "changed like a shirt;" if it could, the Berlin wall would never have come down and the players of the Croatian soccer team would be playing for Yugoslavia. Untrue. Nationality can be changed. Clearly, on an individual level, people emigrate all the time. How many Cubans and Dominicans have moved to Puerto Rico this century? Do these people universally remain Cuban or Dominican at heart, or do some grow to feel more Puerto Rican? Do none of these emigres seek U.S. citizenship, and of those that attain it, do none feel pride in their new status? What about their children, who are raised as U.S. citizens in Puerto Rico? Are they bound to retain the nationalities their parents were born with? Even rudimentary consideration of her position demonstrates its fallacy, at feast with respect to individuals. But be-

---

16. Mayra Montero is an exceptional, award-winning author. Indeed, notwithstanding the different ideas the Court has pertaining to her position on the issue at hand, I consider Ms. Montero to be one of Puerto Rico's most talented writers. We respect her historical perspectives, particularly considering the opinion discussed by the outstanding Puerto Rican novelist, Rosario Ferré in her book THE HOUSE IN THE LAGOON discussing the concept that novelists are better historians than historians themselves.

yond the individual level, whole communities can change nationalities. Throughout history, nations have assimilated into other nations of their own free will. Consider Hawaii. Consider the unifications of Italy and of Greece. The examples Ms. Montero uses are of a nation forced to split and a nation forced to join, not of their own free will, but by the will of others. East and West Germany were split by Germany's enemies as a result of Germany's defeat in World War II; Yugoslavia was formed into a federal republic, also following World War II, under Russian control. Those examples teach nothing about political unification made of the free will of the people.

Next, Ms. Montero argues that nationality derives from being born, growing up, and maturing in a place in common; from a shared way of laughing, crying, suffering, celebrating; from familiar ideas and dreams; from a common form of expression, both verbal and symbolic; all of which come not only from our experiences, but from those of our progenitors. But even if Puerto Rico could be described as a bundle of standard idiosyncrasies—a notion that seems both unlikely and cruelly unfair to those Puerto Ricans who do not share them—can such idiosyncrasies rightfully form the basis of *nationality?* Even if such stereotyping were morally permissible, are the people of Puerto Rico so narrow-minded as to reject *political union* with those who do not share such shibboleths. Has the example of the United States not taught the world that a multicultural society is a national asset, not a basis for separation? Is the attitude professed by Ms. Montero not, to some degree, the same that has motivated "ethnic cleansing" in the republics of the former Yugoslavia and in several African nations? And at what point does it end? People from San Juan have their own eccentricities apart from those of people from Ponce who in turn do not share all such mannerisms with the people of Isabela, and so on. Even within San Juan, those who grow up in Punta Las Marías probably will not communicate with one another exactly the same way as those who grow up in Miramar or Old San Juan or Stop 20. By Ms. Montero's reasoning, each municipality, or even each neighborhood, comprises a nation unto itself. Perhaps this is hyperbole, but the Court only wishes to demonstrate the error of equating such characteristics with the concept of nationality. The undersigned judge holds the more enlightened view to be one encouraging people to strive to attain mutual political goals while accepting, learning from, and embracing different ways of laughing, crying, and celebrating, sharing the dreams of others, and learning to communicate in other languages.

In the end, the culture that matters, that describes the way in which people must be compatible in order for political union between them to be possible, is political culture; that is, we must focus on political culture when assessing the cultural compatibility of Puerto Rico and the United States.

Even a brief analysis of political culture reveals that Puerto Rico is more akin to the United States than to its Latin neighbors.[17] The political history of Latin America is one of dictatorship and its concomitant evils, corruption and civil war. Deriving from the notion of *caudillismo*—the distinctly Spanish philosophy of the ordering of man and his universe under which the individual's ego is so strong that it preempts broader concepts like community or nation—Latin American political systems have been little more than personality cults paying homage to political leaders, from the conquistadors, like Pizarro and Cortés, to the leaders of independence, like Bolívar and Hidalgo, to more recent heirs to power like Santa Ana, Perón, Castro, and Pinochet. Under political systems based on *caudillismo*, the governed in Latin American have placed less importance on ideals like liberty and justice than in the leader who is to incarnate those ideals. And the governing dictators have, also in the spirit of *caudillismo*, emphasized political separation over unity as a means of distinguishing and aggrandizing their *personae*. Employing personalistic political systems and elevating men over ideas have led to, in contrast to the

---

17. The Court accepts the standard definition of Latin America as comprising Spanish America and Brazil. *See* Webster's Third New International Dictionary 1276 (1993).

United States, nations of men, not laws. Witness Simón Bolívar's message to the Bolivian congress, in which he lobbied for the life-term presidency, and thus the legitimization of *caudillismo*:

> The President of the Republic shall come to be in our constitution like the sun, fixed in this center, giving life to the universe. This supreme authority ought to be perpetual, because in those systems without hierarchies there must be, more than in others, a fixed point around which the magistrates, the citizens, and all the elements may revolve. Give me a fixed point, says the ancient, and I will move the Earth.

Notwithstanding the fact that U.S.-style constitutions have been adopted throughout Latin America, few Latin American leaders have felt themselves bound by any constitutional restraints. The result is a national history filled with poverty, suffering, repression, corruption, sycophancy, torture, assassination, and death in the field of battle. Ironically, this result was accurately predicted by Bolivar himself when, commenting on the break-up of Greater Columbia, he said, "this country will fall into the hands of the rabble and then pass to the hands of lesser, ruffian tyrants." [18]

In the United States, on the other hand, we have struggled to ensure that both the letter and spirit of our Constitution, and especially the guarantees of individual liberty contained in the Bill of Rights, have been upheld and left unmolested by the government. While we have not won every battle, as various unhappy chapters in U.S. history attest, we continue to win the war and the United States remains a bastion of liberty, justice, and opportunity.

The tenets of our political system are well-known and much imitated—it is a government of "we the people," by "we the people," and for "we the people." The people have retained the power by limiting that of the government. First, the Constitution enumerates the powers of the national government, establishing a federal system under which the individual states, within their jurisdictions, both share concurrent authority with the national government and enjoy powers not given the national government. Second, the enumerated powers of the national government are divided amongst the legislative, the judicial, and the executive branches. By that system of checks and balances, our founding fathers ensured that those who might have in mind dictatorial authority within the national government would be hobbled in any attempt to consolidate power. Third, and perhaps most importantly, the Constitution ensures that certain individual liberties may not be infringed upon by either the national or, via the Fourteenth Amendment, the state governments. These individual liberties, aside from abridging the governments' ability to impose upon individual citizens—e.g., by protecting freedom of religion, prohibiting the quartering of troops and the taking property for public use without compensation, and guaranteeing due process of law—enhance the citizenry's ability to police the government—e.g., by protecting speech, press, the right to assemble, and the right to bear arms.

Under this system, the citizens of the United States have the right to pursue the ends they desire, subject only to the laws created by those they elect, whose powers are cabined as described by the Constitution. It is a reflection of our founding fathers' philosophy, engendered in every U.S. citizen, and perhaps best expressed by Abraham Lincoln, that "no man is good enough to govern another without that other's consent," in stark contrast to Simón Bolívar's philosophy of the "King Sun" quoted hereinbefore.

Puerto Rico, discovered by Columbus during his second voyage in 1493, remained a Spanish colony until 1898. Because Puerto Rico continued under Spanish rule, it was

---

**18.** Translated by the Court from the Spanish, *"este pais caera en manos de la multitud desenfrenada para despues pasar a tiranzuelos."* The Court's discussion of Latin American culture is but a brief recitation of facts detailed more thoroughly and ideas expressed more fully (and artfully) by various authors in *Dictatorship in Span-ish America* (Hugh Hamill, Jr., ed.1965) and by Plinio Apuleyo Mendoza, et al. in *Manual del Perfecto Idiota Latinoamericano* (1997). *See also* Paul H. Boeker, *Lost Illusions: Latin America's Struggle for Democracy, as Recounted by its Leaders* (1990).

spared the anarchy that followed independence in most Latin American nations during the nineteenth century. In 1898, following the Spanish–American war, Puerto Rico was ceded to the United States. Since the signing of the Treaty of Paris brought the war to its end, Puerto Rico has remained a U.S. territory and its inhabitants have lived under the Constitution of the United States of America. During that time, Puerto Rico and its people have come to embrace the United States Constitution and, in particular, the individual liberties protected by the Bill of Rights. As a result, Puerto Rico has broken, culturally, from its Latin roots over the last one hundred years.

Comparisons illustrate that fact: while the people of Venezuela have lived under the heels of various dictators, the U.S. citizens of Puerto Rico have enjoyed due process of the law and equal protection thereunder; while the mothers of *desaparecidos* wailed in the Buenos Aires' plaza, protesting the killing of their sons and daughters by the ruling *junta*, the U.S. citizens of Puerto Rico have freely elected their governors, replacing four different administrations since 1968. While communist guerrillas were plundering Nicaragua following the reign of terror of a murderous dictator, young men from Lares, Fajardo, Yauco, and Rincón, fighting as part of the United States military alongside their brothers-in-arms from Baltimore, Peoria, and Salt Lake City, have protected the world from Hitler, Ho Chi Minh, Saddam Hussein, and others who would threaten the principals of freedom embodied in the Bill of Rights; while Jesuit priests were murdered in Central America for attempting to disseminate ideas about personal liberty, U.S. citizens from Aguadilla, San Lorenzo, and Humacao, availing themselves of the right to free speech protected by the First Amendment, have expressed their views without fear; while the poor and downtrodden throughout Latin America have lived without hope of bettering their lot in life as some of their leaders plundered their nations of resources and wealth, the U.S. citizens of Puerto Rico have lived in hope and security as part of a nation that, as Franklin D. Roosevelt put it, judges its progress not by "whether we add more to the abundance of those who have much, [but by] whether we provide enough for those who have too little."

Perhaps the most telling comparison is between Puerto Rico and Cuba, two Caribbean islands with nearly identical histories up until the signing of the Treaty of Paris, when Cuba became independent and Puerto Rico became a U.S. territory. Since 1898, Cuba, without benefit of the United States Constitution, has wallowed in poverty and corruption, mostly under dictatorial rule. Throughout this century Cubans have fled by the thousands to Puerto Rico and other places in the United States seeking political and economic freedom.[19] On the other hand, U.S. citizens throughout Puerto Rico have prospered since the Treaty of Paris under the democratic-capitalist system protected by the United States Constitution to achieve a higher standard of living than any Latin American country, despite having fewer natural resources than most.[20] Puerto Rico's cultural ascent since becoming a part of the United States is demonstrated in a recent article published in The San Juan Star describing life in Puerto Rico at the end of the nineteenth century. The article recounts the observations made by historian Henry K. Carroll, special commissioner for the United States in Puerto Rico, in his "Report on the Island of Puerto Rico; its Population, Civil

19. This migration increased dramatically when Castro came to power. The first wave of Cubans to immigrate to the United States were mostly formerly wealthy, well-educated Cubans in self-imposed "exile," displaying their anti-dictatorial stance. Since that initial exodus, however, Cubans of all walks of life have continued to migrate to the United States in search of a better way of life. The influx of Cubans has generally proven a mighty asset to the United States. If there is no political freedom, there can be no economic freedom where individuals can develop their innate abilities. That is why the United States main claim to glory is not predicated upon the powerhouse of Wall Street but the Bill of Rights that protected the rights of citizens in a free society which created society of equals devoid of the caste system and made possible a Wall Street and the American Dream.

20. The Court believes that economic culture is, if not part and parcel of political culture, at least a reflection of political culture.

Government, Commerce, Industries, Productions, Roads, Tariff, and Currency."

> To write the report, Carroll traveled the island, visiting private homes, plantations, factories and anywhere else he could get to in order to form not just a census portrait—the 1897 census was provided to him by autonomist leader Luis Munöz Rivera—but to get a sense of the island as a whole. What he found was a population that was often living in squalor, many dying of "starvation of the slow kind which gradually saps the strength, weakens the willpower and prepares the way for disease."

Natalia de Cuba, *Life in Late 19th Century Puerto Rico was Tough,* The San Juan Star, July 25, 1998, at 7.

De Cuba's article gathers in some detail the hardship Puerto Ricans living on the island confronted on the eve of the twentieth century, in areas such as labor, housing, and education. As narrated by its author, the mass of the Puerto Rican workforce earned far below living wages and did not enjoy the protection of labor laws, which were virtually nonexistent. They lived in sub-standard housing and confronted soaring rates of illiteracy. "Carroll estimated that 80–85 percent of the population was illiterate...." *Id.* Notwithstanding these conditions, Carroll considered the populace to be full of untapped potential. "Porto Ricans have had little opportunity to show their capacity," he wrote. *Id.* Things in Puerto Rico have obviously changed for the better since the island was ceded to the United States; in Cuba they have not. Indeed, anyone wishing to see today conditions similar to those described by Mr. Carroll in 1899 can find them throughout Latin America. It is the espousal of the U.S. political culture that finally provided Puerto Ricans with the "opportunity to show their capacity"—an opportunity that the people of Cuba and the other nations of Latin America have not been given, at least not nearly to the extent the U.S. citizens of Puerto Rico have.

Perhaps culture is best defined as how people act and think in their everyday endeavors. In Puerto Rico, where the United States Constitution has provided the framework for the way of life for one hundred years, the people have become accustomed to thinking and acting freely, knowing they are at liberty to do so. In Puerto Rico, the people move in an atmosphere of their own creation as free men under a government to which they have delegated a limited power to govern; they live in a culture of personal freedom. That culture of freedom has nothing in common with any so-called Latin American culture and everything in common with the culture of the United States. In sum, the ideology which encouraged the Defendants to discriminate against Plaintiffs in this case, and any ideology premised on the notion that Puerto Rico's is a Latin American culture incompatible with U.S. culture, misunderstands both the meaning of the culture at issue and the true nature of both Latin American culture and the culture of the United States.

## VII. CONCLUSION

The Court hereby **ENTERS JUDGMENT** for Plaintiff, Joanna DiMarco, to have and recover and to be paid jointly and severally from codefendants María Socorro–Cintrón, Awilda Vilches–Reyes, and Eddie Nieves, Mary Jo González, Federico Cedó–Alzamora, and Eusebio Cabanillas the sum of **One Hundred Sixty–Eight Thousand Four Hundred Fifty–Four Dollars and Forty–Three Cents ($168,454.43)**. Said amount includes $89,404.43 for compensatory damages, including mental and emotional suffering, $50,000.00 for punitive damages, and $29,050.00, for attorney's fees plus costs and interests.

IT IS SO ORDERED, ADJUDGED, AND DECREED.